Good morning. Illinois Appellate Court First District Court is now in session, the Third Division. The Honorable Justice Nathaniel House presiding. Case number 1-9-1420, Meeks v. Nesanayake, MD. Good morning, ladies and gentlemen. My name is Nathaniel House. I'm a judge on the Appellate Court and presiding over this case with me are Justices David Ellis and Eileen Burke. This case is being heard via Zoom due to the COVID crisis. We're going to follow this procedure today. Each side will be given an opportunity to present 10 minutes of uninterrupted presentation in turn, and after which the judges will have an opportunity to ask questions. After both sides have made a presentation, the plaintiff will be allowed to, the appellant will be allowed to make a short rebuttal, after which we may ask questions of either side. I note that there are two parties representing defendants in this case, and have you decided how you're going to divide this time up? Yes, Your Honor. Michael Trucco on behalf of Elizabeth Shriver and Mark Jasper. I will address the issues first, and I take it from Your Honor's comments that Ms. Weiler and I split the 10 minutes? Yes. Okay. I will take no more than seven, Your Honor. Ms. Weiler? Yes, we've agreed to that, Your Honor. Okay, who's going first? Mr. Trucco. Okay, all right. Do we have any other questions about how we're going to proceed today? For the parties who are going to make a presentation, state their names and the parties they represent. I believe I'm first. I'm Leslie Rosen. I'm here on behalf of the plaintiff appellant, Tiara Meeks. I am Michael Trucco. I'm here on behalf of Appellees Elizabeth Shriver, RN, and Mark Jasper, APN. Katherine Weiler on behalf of Dr. Diseniaker. Okay, very well then. If there are no other questions, Ms. Rosen, you can begin when you're ready. Okay, thank you, Your Honor. May it please the court. I am here on behalf of Tiara Meeks, the daughter and independent representative of Elaine Jones, who suffered a wrongful death at the University of Illinois Hospital. I know you're familiar with the general facts, so I won't belabor them other than to say she died of sepsis seven hours after she arrived at the emergency room where she worked as the registrar. Today, I'd like to discuss three interrelated issues. The first issue really controls pretty much the second and the third issue. The first issue is whether the trial court erred in barring plaintiff from recalling her primary causation expert, Dr. Gabeef, in her case in chief when she forgot to ask him approximate cause questions on her direct examination. The other question was, did the court err in granting a directed verdict to the nurses in this case? And if the court erred in granting a directed verdict, should this court grant a new trial against all defendants, even though Dr. Diseniaker, who I will now call Dr. D, should she be included in any new trial, even though the jury found in her favor? I also have another argument in my brief, but I'll rest on that. But preliminarily, before I get into the question of Dr. Gabeef, I have an important point here, and that is when I was preparing for this and looking over my brief, I have a huge mistake in my brief on page 18. And it's a central mistake, and it revolves around when Ms. Loggins asked to have Dr. Gabeef recalled. And in my brief, I say that she asked the next day, and in defendants' briefs, they both say she asked two days later, and that's a significant difference. And so on page 18, I cite the record on this 1238 to 1242, and you go to those pages in the record, and there is nothing there that's remotely on point, and I look to be quite the liar and the crazy liar. And I couldn't find it anywhere near there, but it is in the common law record of those pages. And for some reason, which I don't understand, this is in the beginning, right before, this was on the morning of the 29th, the conversation about Dr. Gabeef resumed. It had happened off the record on the 28th, and it resumed right before Scott Gore's testimony. He was one of our expert witnesses, and it's in the post-trial motion transcript, but somehow, when the full trial transcript was put together, it's not there. So I just want you to see everything I did say was true, and it was in the record, but it's not where I said it was. It's C1238, not R1238. And that's important to me because it speaks to my credibility. Okay, so my major issue here is whether the court should have allowed Places to recall Dr. Gabeef. There's no question that Ms. Longin's made a mistake. She calls her first witness. He's there for standard of care as to the doctor and causation as to the nurses. She totally forgets to ask him any causation questions, no question about it. She realizes it the next day, and she asks to recall him. And at first, there's no, well, Mr. Trucco objects saying that he'd be prejudiced, and the judge says, well, I'd be more likely to be reversed if I didn't call him back because it's a case in chief. The next morning, he then argues relevance, and then he says, we have no objection. Then they both have an objection, and then they raise, ah, 213. It wasn't disclosed. It is 213, and Ms. Longin says it was disclosed, and moreover, it's in his notes. The court says, well, we're not having anybody look at his notes. That's, like, way beyond the pale, and it's not in the 213s. So my position is, number one, she was dead wrong on both, okay? And my position is that they were just rolling up anything they could on the wall to see what would stick, and 213 finally stuck on the third try. So if you go to the record and you look, Dr. Grief says it in his affidavit. It goes, it was a 2622 affidavit. In the beginning, and he says in his report, and the report in his conclusion is so clear. It says it on the first page, and it says that there were gross, in the first page of his report, he says an unusually large number of mistakes and acts of malpractice occurred during those seven hours, cumulatively reflecting gross negligence by a variety of staff members and physicians. Then he lists them, and in his conclusion, he then says, the hospital mistriage, the failure to be seen in a timely manner, the nurse practitioner inability to recognize and communicate effectively with the provider, and the provider's ill-informed and poor decision-making at the critical moment constitutes gross negligence in failing to meet the standards of care in this critical, life-threatening situation. So he accuses them of gross negligence, all three of the defendants, gross negligence. Gross negligence includes proximate cause. And you can really see how false the argument is by the defendants in this case, by the fact that they have no motion in limine prior to the trial. This is a small record. It's over 2,000 pages, but there's nothing much in it other than the transcript and the motions in limine and the post-trial motions. They have motions in limine to bar the doctor from giving standard of care opinions as to the nurses. They don't have a single motion in limine about barring Dr. Gabee from giving proximate cause opinions, because that was the heart of his testimony. They also don't have a motion for summary judgment. And you would think, these are extraordinarily competent attorneys, that you would think if there was no proximate cause opinion, this case would have been over before it started after the nurses. But it wasn't, and there is no motion for summary judgment. So then you look at his paragraphs of opinions, and there's over 50 of them. He says in there that Ms. Jones was mistriaged. She was triaged as ESI 3, which is the middle of the road for an emergency room triage. I trust you know what that's about. If not, I can explain it. And, okay, fine. He can't tender those opinions. He cannot give standard of care opinions as to the nurses. I understand that. That's the law. It's Sullivan versus the hospital. But that's not to say he can't form those opinions. And the Wilson versus Clark, and then based on those, come up with proximate cause. I don't think it's fair to say that because he didn't read one of the experts' depositions, that he can't give those opinions. There's nothing that says he can't rely on those. It is just like I can't until now, until recently, I can't quote or rely on Rule 23 decisions, but that's not to say you can't read them. You can, and he can, just the same way under Wilson versus Clark. He can look at the records, which he's done, which he's capable of doing, and he can form opinions about the standard of care and then testify as to proximate cause. He says at paragraph 53 that a nurse practitioner put Jones in the hall without examining her at all and apparently not fully aware of the history. And so he gave those causation opinions. Then he gave causation opinions. And if he didn't find them there, they're in the 35 pages of notes. Well, what is it? Is it fair to say? Not in his report? Oh, fabulous. Okay. I think not. They ask for the notes. You have to turn over the notes. They ask questions in his deposition about the notes, but I think this is like the height of gamesmanship. He talks about his notes. And once they asked about the notes and once they deposed him, then you can't say that the notes go all over the place on proximate cause also. So the question is, in a situation like that, what happens then is the next issue is should they have gotten, the nurses have gotten a directed verdict, and the trial judge relies not only on the fact that there's no opinions, but that the defendant doctor testified, well, even if they had told me she had a spleen, she had no spleen, I wouldn't have done anything differently. Even though she also testified that it was very important to know, she said, I wouldn't have done anything differently. And that's like the end of the game under Seif versus Ingalls. And your colleague, Justice McBride, wrote in her dissent that that's not right. And the appellate court recently wrote in the Guow opinion, which is, I have here, 2020, July 1st, 19090, a doctor saying that I wouldn't have done anything different had I been given the information that I should have had. That's not a basis for a directed verdict or summary judgment. It's only evidence of malpractice, and it's something that the jury should consider. In this case, the doctor was just saying, basically, she was confessing her own malpractice, in my opinion. So there was no basis. First of all, if there should have been a recall for the causation opinions, and we know the causation opinions were available and disclosed, then there shouldn't have been a directed verdict. And the court shouldn't have just said, well, game over because of the doctor's comment. And so finally, why should she be back in the case? Why should she be back in the case? She had a full, fair hearing. That's a very good argument on the defendant's part. I like it, except for the fact that this whole case revolved around the nurse's miscommunication and then the doctor's. It was a Gordian knot. It was intertwined. From the very beginning, if you look at Ms. Logan's opening statement, she's talking about the spleen, the spleen next to me. And the whole context of the case revolves around the miscommunication, answers and failure. So it seems to me unfair that the trial, that closing argument was stilted and everything else, and that's about it. Okay? Thank you. Thank you, Ms. Rosen. Justice Burt, do you have any questions? I do. Ms. Rosen, is it your position that as long as it is in the doctor's notes, his report is somewhat irrelevant? Pardon me? Is it your position, you seem to be arguing, that they had the information in Dr. Daboff's, am I saying his name right? I don't know. That it was in the notes, and therefore they were apprised of the information. So is it your opinion that as long as it's in the notes, what's in the report doesn't matter? No, that is not my position. It's like icing on the cake is my position. It was disclosed, the proximate clause in his 2622, it was disclosed in his report, and it was disclosed in his notes. Then why do we even have to go to the notes if, according to you, it's all over the place? Why are you advocating that they need to go look at the notes? Because they ask, why do we turn them over in discovery? The defense insists on getting every note, they insist on looking at it, because this was gamesmanship. It's just an indication that it's pure gamesmanship. They ask questions about the notes, and then during the deposition, and then they choose not to ask certain questions, and then they get to use it as a sword. And I don't think that's fair. So in this particular case, not necessarily every case, but in this case, where it's everywhere, it even says it's screaming at us that it's not fair. And I cite one case where it becomes like a logical corollary. I didn't even argue about a logical corollary. It's a logical corollary, too, and it's disclosed, and it should be enough. You don't have to have perfect. Everybody's not entitled to a perfect trial, but to a fair trial. And this case, it was a two against one fair fight, but they got away with something they shouldn't have. Okay. So let's go to the nursing experts. So DeBoer testified about Schreiber's actions that night. Is that correct? Yes. And DeBoer's testimony was that fluids and antibiotics, the standard of care would have been that those two things were given within an hour. Is that correct? Within an hour of they were given within an hour of... That would have been the standard of care under DeBoer's opinion, right? Yes, but not the amount of fluids that was given. But DeBoer's opinion somewhat conceded the standard of care argument with regard to Schreiber. He didn't examine her. Had he examined her? You cannot ignore the splenectomy aspect of it. He says, I didn't examine her because she was in the hall. But they also say, well, the bed in the hall is like a bed in a room. So to me, well, they didn't embarrass her, but they didn't examine her. She's in the emergency room. So they should have disrobed her in the hallway. They could have looked up her shirt, or they should have put her in a room. I mean, that's why it's all so intertwined. Had she been properly identified as an ESI 2, they would have put her in a room theoretically, or they should have put her in a room. It's not what they would have done. It's what a reasonably competent nurse would have done. Okay. So let's move on to Jasper, who testified regarding Harris. Harris, you started backwards. I'm sorry. So her expertise was in pediatric nursing. Is that correct? I believe so. She was a pediatric nurse. And in fact, she had never triaged patients. That may be so, but that goes to the weight. There was no motion. I understand. I just want to make sure I understand the record correctly. So her position, having never triaged a patient, was that the deviation from the standard of care was that Jasper should have viewed all medical history and lab data. Is that correct in determining the triage assessment? They should. Honestly, I have to go back to my. Okay. That's fine. So based on those two experts, if you want to call them experts, based on those two experts, where was we have one that pretty much conceded that standard of care was met, and the other one has never triaged a patient, but she's somehow talking about triage. So I'm not sure where we're getting that Dr. Duboff's opinion would not have been standard of care. I'm not even seeing that standard of care was established by the opinion of these two experts. Well, going back to the second expert, there was no motion to bar her for lack of qualifications. And I know you can affirm a judgment on any basis that appears in the record. I know that. But there was no argument about that. And there was no claim that she was not competent to testify. And she testified, and they all testified about the triage. I mean, they cross-examined her about that, obviously. Could you point to something in the record for which one or both of these witnesses somehow established that they were negligent? Because I'm not seeing it. Well, they established the standard of care, and Dr. Duboff wouldn't have established the causation. Okay. Where did they establish the standard of care? Okay. I'm sorry. I'm looking at my brief. One minute. Nurse Harris opined on page 20, I have, that failure to timely assess. She listed eight separate deviations in her 213 answers from standard of care, failure to timely assess, failure to take an adequate history such that she didn't know about the splenectomy and was not taking steroids, failure to diagnose the infection, failure to timely administer antibiotics. Ms. Rosen, let me interrupt you for one second. The point of triage is to get people seen quickly and to determine what the level of emergency is. Correct. Okay. So how would a pediatric nurse know that if she's never done that and never worked in an emergency room? How is it possible that she could opine on someone else's failures in an area where she's never worked? I'm just saying that's not an issue in this case. She gave the standard of care. So the court found that the standard of care wasn't established by either of these witnesses. So by not allowing the doctor to be recalled for them, she was precluding a standard of care opinion from that expert, wasn't she? No, she was precluding a causation opinion. Which would have been based on what standard of care deviation? The standard of care deviations that the nurse Harris testified to, that there are multiple orders, when she was in the emergency department that fell under Mr. Jasper's name, there were important lab results that were not adhered to in a timely manner, and when she was transferred there was inadequate history of inappropriate medications as well as an ineffective report. Those are the deviations from the standard of care. Okay. Thank you, Ms. Rosen. I have no other questions. Thank you, Justice Burke. Justice Ellis, do you have any questions? I have a couple. Good morning, Ms. Rosen. If I'm looking off to my right, it's not because I'm inattentive. It's because I'm looking at my notes in the record. So if I keep looking away, it's not because I'm not paying attention. It's because I am paying attention. Let's talk about the report first, Dr. Gabeff's report. And this, of course, was referenced in the 213 and incorporated into the 213 and provided along with the 213. Is that right? Yes. Okay. So I think I've read this pretty carefully. There's a conclusion, there's an introduction, and there's a series of numbers, one through something like 53 or something. Tell me what you would highlight. I know you've got a lot in your brief. You mentioned that you said that proximate cause is in here. What should I be looking at? I think the strongest evidence is the conclusion. It's in the introduction. It's in some of the paragraphs. But the strongest one is the conclusion, which I read earlier. It says the hospital mistriaged, the failure to be seen in a timely manner, a nurse practitioner, inability to recognize and communicate with the provider, and the provider's ill-informed and poor decision-making at the critical moments constitute gross negligence in failing to meet the standard of care in this critical, life-threatening situation. Okay. Gross negligence includes duty breach, proximate cause, and damages. Oh, that's what you're saying? You're saying by saying gross negligence, you were incorporating proximate cause in there? Yes, I'm saying that. And he's incorporating what caused the failure to meet the standard of care. That's also deviations, but I am saying that. And then the notes do amplify. But if you look also, it is 2622, which was attached, which is also incorporated in all this. He says it in there, too. If there had not been this gross negligence, she would have had the standard of care been followed. She would have had a greater than 50% chance of being alive today. Okay. Now, let's talk about the deposition. I understand that you're not in control of the questions the defense attorney asks, and you don't. Sometimes plans fulfill the need to fill in gaps by asking their own questions, and sometimes they don't. And I have not reviewed the deposition. So, in the deposition, did Dr. Gebeth talk about causation with regard to the, let's start with the doctor. Did he talk about causation there, whether the doctor's negligence caused the death? Do you recall? I don't recall because I wasn't concerned with the doctor, but I looked. Okay. He did not talk about it in terms of the nurses. He did not talk about it. And could the plaintiff's attorney have done a better job at the deposition? Might I have done a better job at the deposition? Might I have asked since it didn't come out? Should I have asked? Should he have asked? No question. Could have done a better job. But I guess I want to know what the doctor in his deposition did say about the nurses. First of all, did he disavow that he had any opinions about their standard of care? Did he say, I'm not going to testify about that? He said he wasn't going to testify about Nurse Jasper, if I'm correct. Mr. Trucco seems to be shaking his head that I'm right. He tried the case. What about the other nurse? He was asked about paragraph 53. Right. Right. And he did say that the nurse put, this is still back to Jasper, right? Okay. Yeah, right. That's Jasper. Yeah, that's Jasper. He corrected that, right? He said that was. Yes. Yes. That's fine. That's fine. Did he talk about cause eight? So he did not talk about causation with the nurses with regard to the nurse's behavior? No. The only thing is, as far as the doctor, however, in my brief at page 16, Mr. Condren, plaintiff's attorney, did ask the doctor, and in your report you mentioned as far as Dr. Disanayake was concerned that she failed to assess Ms. Jones correctly. Is one of those failures not to check the medical record from the clinic to determine her lack of spleen so that she could further understand the patient was immunocompromised? And the answer is yes. And there was no follow-up to that. Okay. Yeah. Right. Right. Okay. I'm with you. I'm reading this. Okay. So in the deposition with regard to, I can't remember the name of the other nurse besides Jasper. There were two nurses, right? Shriver. Thank you, Shriver. What about Shriver? Did he say anything about Shriver's performance, be of care, you know? In the deposition? Right. Or did he disavow, again, that he was going to? Did he say on that? No, he did not disavow. There was no disavowing. Okay. But I don't think nobody asked. But it was, I don't believe, it was in his 213 answers. Let's see. Okay. I'm going to review the deposition. I just haven't gotten to that point yet. Okay. I'm sorry. No, no. That's quite all right. You've done fine. Thank you. Absolutely. That's all I have for right now. Thank you. Thank you. Thank you. Where in the record does Dr. Gabas raise the issue of sphenectomy or spleen? You know, is this where the plaintiff is saying hide and seek? Okay, we're going to say not complete record, but what we really mean is sphenectomy. Where exactly? Well, first of all, it's all over his notes. I'll say that. That should be, if you're going to consider that, and Justice Burke was asking me my position on that. It's all over his notes, the sphenectomy. But they didn't examine her. Ms. Jones did disclose she had ITP. Which is a clotting problem, and that's all over the record. And based on that, they should consider the sphenectomy. Apparently, and I know nothing about ITP, but apparently with that clotting problem, it's very common. In the record, it says that you have a sphenectomy. And that's because when you have a sphenectomy, you're much more likely to have problems with fighting infection without your spleen. So in the notes, he says, which is Exhibit B, page 1 of 35, he noted that Elaine's entire history was in her clinic record, and the history noted that she had ITP, a definite risk factor for infection. He noticed her mental, did not check her history, did not know about her spleenectomy, even though the records were available to her. None of the triage nurses know about it. So that's all in the notes. And in the opinions, the 53 paragraphs of opinions, let me just check those. She had SIRS. She does, they do know about these. I'm looking in those 53 paragraphs, and I don't think it's in there, is it? It's in the other. But as Judge Basisti said, it's screaming at us. You go right to the opening statement. That's what it's about. That's what these nurses were in here for. Not knowing about this and not giving an accurate presentation at the very beginning so that she would have been triaged correctly and theoretically seen properly, even if your ESI-3 is supposed to be seen within 30 minutes. And the nurse Shriver was surprised when she wasn't seen in an hour. But in his conclusion, it's the hospital mistriage. The mistriage incorporates the spleenectomy. That's the mistriage. That's the essence of the mistriage. I'm sorry, can I jump in here? Absolutely. The mistriage could encompass anything in her medical history, according to that, right? Anything that she disclosed or didn't disclose, but because the spleenectomy, that could, mistriage could cover everything, right? No. She disclosed ITP. She disclosed that. If you disclose that, I mean, tell me you have ITP. It doesn't mean anything. And it might not even mean anything to somebody who doesn't do triage. But it should have meant something here. So the mistriage can cover the spleenectomy, but not anything else that she might not have disclosed. There's nothing else that she didn't disclose that was relevant. I mean, she disclosed her ITP, and she disclosed her recent prescription for metformin and diabetes, which also can be an important indicator for an ability to fight infection. So the mistriage now covers a panoply of things. Well, it covers the matters at hand. If you look at the record, there are other times she was at the ER, and those are not relevant. I don't expect her to be. She disclosed the two important things that should have led to a question. Later she was blamed by the doctor. Well, I asked her for a history, and she didn't tell me. Like, it's her job. She told the ITP. This is not a doctor. She's not responsible for diagnosing herself, and she disclosed what would have given a reasonably competent, careful doctor in this instance the information needed to consider sepsis quicker and treat it effectively. Thank you. Anyone have any other questions? Okay. All right. Very well, then. Mr. Shriver, you may proceed when you're ready. Thank you, Your Honor. May it please the court, counsel. Just by way of background, a couple of facts. Nurse Shriver was in triage. That's out in the outer area of the emergency department, and she did the initial triage, checked back on the patient after she moved to triage 2 at about 6.50. At some time thereafter, the patient was moved to the hallway, to a hallway bed. It was in that hallway bed that Mark Jasper, an advanced practice nurse, came upon Ms. Meeks, and that's when his encounter started with her at approximately 8.24. And I just want to set the stage for that for the court just to make sure it's clear where the different pieces fall in. As it relates to the issue before the court, especially as it relates to Dr. Gainback's opinion, his report is critical because the basis for which his conclusory causation opinion in the conclusion stems is a missed triage. And if the court looks, it's at common law pages 1045 and 1046. In paragraphs 3 through 6, the failure to obtain a history was a failure to obtain a history of the signs and symptoms of SIRS, systemic inflammatory response syndrome. Justice House, to answer your question, nowhere in the report, nowhere in the deposition was the word splenectomy or the history of steroids included as a basis for a causation opinion. That's very critical. Similarly, with respect to paragraph 53, where there's a reference to the nurse practitioner, Mr. Harris, I'm sorry, Mr. Jasper, in the deposition, he said, I canceled the statement. He canceled the first part of the statement. The question as to whether the second part he still relied on, I don't know. But the importance is, there is nothing in the report or the deposition about a history of splenectomy or a history of steroids and how that should have informed a triage category. And that's important because there are disconnects between his proper causation opinion and what the standard of care opinions were. Justice Scott DeBoer, the RN nurse testifying against Nurse Schreiber, his criticism was Nurse Schreiber failed to get a complete history at triage of splenectomy and steroids. Okay. The disconnect is Gabe F's opinion was based on a failure to get a history of the signs and symptoms of SIRS. And that was the disconnect between the causation opinion and what the evidence of the trial was. With respect to Nurse Jasper, at 824, Nurse Harris had all sorts of opinions about what he should or shouldn't have done at 824. But importantly, Gabe F never reviewed or relied as a basis for his opinion on Harris' testimony for opinions and critique. And that's critical. That's another disconnect between the causation opinion and the proffered standard of care opinion. And the plaintiff argues here that it was enough that the words are in the notes and everybody knew what they were talking about. The experts weren't even clear on what a complete history was. DeBoer said the complete history was a surgical and medication history, splenectomy and steroids. Gabe F, in his report, the mistriage was based on a lack of a history of the elements of SIRS, systemic inflammatory response syndrome. And that's the issue. Those were the disconnects. And that's very critical. And as it relates to the issues, importantly, in the deposition of Dr. Gabe F, the only causation testimony given was about Dr. Dysoniac. None. There were no follow-up questions by anyone. Defense counsel weren't going to invite opinions or bases that were not previously disclosed. The Sullivan case says we have a right to rely on the disclosures. So what happens? Plaintiff never supplemented. Never supplemented. But what plaintiff did do, and this is evident in the common law record at C-311, they named a rebuttal infectious disease physician. And they were granted leave to name a rebuttal infectious disease physician. And the significance of that is Ms. Rosen says, why didn't they bring it as a summary judgment motion? At the time, the record had, the discovery record had the disclosed opinions of the rebuttal witness, infectious disease, who, unlike Dr. Gabe F, reviewed Nurse Harris' report and gave opinions about causation but as rebuttal. And they were not allowed to call him in the case in chief and they withdrew him as a rebuttal expert. But the point of it is, is that why not summary judgment? It was not argued in the lower court. It was not argued in the briefs. I'd submit its way. But that's the explanation as to what the record was. And in terms of a timely objection, the motions in limine by all parties argued that undisclosed expert opinions were barred. And, of course, that's a standard motion in limine in any trial. But on November 28th in the AM session, and the court will see it at the record, it's page 6, starting at 616, when the testimony started going towards splenectomy and steroids, there were timely objections made that it was irrelevant. And that's what begat the whole spate of different arguments, I'm sorry, different comments that the procedural history that followed, I should say. Now, in the remaining time, a couple of items that are important. With respect to the notes, we got, and the record shows this, that three days before the deposition of Dr. Dabeff, we got 35 plus pages of notes. The plaintiff relies on those notes to say that that was a complete disclosure. In a three-hour deposition, it's not incumbent upon the opposing party of an expert witness to have to ferret through those notes to find out what the plaintiff or their expert or any party or their expert believes is important. The law under 213 is clear. You have to drop down to specifics. And if it was important enough to be a basis for an opinion or an opinion, it should have been in the report or made as a supplemental report or a disclosure that never happened. And with respect to the plaintiff cites the spatial case, I would just submit to the court that that case is completely different than this case because in that case, the expert witness disclosed in written interrogatories that he had reviewed the images, he had reviewed all of the images, and as a basis for his conclusions as to what the images showed. And that's exactly what he said at the time of trial. And in that case, the opposing lawyer chose not to question it. That's not like this case. It was never a disclosed opinion where Dr. Schreiber, that is a failure to get a complete history of SERS, was what the standard of care expert was disclosed to testify about, that is, a complete history related to splenectomy and steroid use. Counsel cites the Wilson v. Clark case. Wilson v. Clark was 1981. Rule 213 was enacted in 1996. Thereafter, there's never been an exception in the rule or any case that I know of to excuse disclosure based on Wilson v. Clark. And I see I've wasted my time, Your Honors, and I've gone into Ms. Weiler's time, and I don't want to do that, but I would just conclude by saying that given the disconnect, given the proper ruling, which was clearly not an abuse of discretion by Judge Budzinski as to the improper disclosure of the proper opinions from Dr. Schreiber, I think that there is an essential element to prove in a medical negligence case, and we will otherwise rely on the briefs, and I would welcome any questions the panel has. Thank you for your time. Thank you. Three minutes, Ms. Weiler. Thank you, Your Honor. And of course, Mr. Trucco did not invade my time, although I appreciate his graciousness. May it please the court. As Mr. The arguments related to Dr. are both very, very few and are fundamentally completely different from the arguments that have been raised against the nurses. Dr. The case against Dr. went through the whole trial, went to the jury, the jury evaluated all of that evidence, and the jury found in favor of Dr. There is absolutely no reason that has been identified by the plaintiff that this court should take the extraordinary step of disturbing that jury verdict. There's been no argument of any sort of legal merit, and there's been very little argument about why that would be an appropriate exercise of justice. On the contrary, taking away a jury's verdict would be fundamentally unjust. There are two issues that the court needs to consider relevant to Dr. None. There is no discussion of trial error as to Dr. in the appeal. On what legal basis should this court then reverse a jury verdict for Dr. None has been argued. Second, the plaintiff concedes Illinois does not recognize a unit judgment. That is not the law of this state. To the extent a jury renders its verdict for one defendant in a multi-defendant case, this court absolutely has the authority to affirm that judgment for that single defendant in the event this court were to remand any portion of the case as the other defendant. There is no reason in this case to exercise a unit judgment. So the issue here becomes, has the plaintiff identified any sort of interdependence of the rights of the defendants, any other special factors that somehow would allow this court to exercise in its equitable powers, a reason to remove the jury's verdict for Dr. And again, there has been none offered. The evidence is clear from the record. I will not belabor it. But at trial, all of the parties were able to present their cases as involves Dr. Dr. was allowed to testify about his opinions related to Dr. was allowed to present her expert testimony, which was to the contrary from Dr. who testified there was no causation from Dr. who testified there was no deviation by Dr. from the standard of care. And on that basis, the jury rendered its verdict. That verdict should be affirmed. This whole case, as Ms. just argued just now, she claims this whole case revolved around miscommunication and failure. The jury heard all of that evidence. They heard all of that evidence and all of that argument as to Dr. and the jury found for Dr. We're asking that this court affirm that judgment to the extent the court has any other questions. I'm happy to answer them. Thank you. Just as Bert, do you have questions? Yes. Ms. Wheeler, how do you respond to kind of arguments that they were intertwined? And once the trial court directed out the nurses, that it gave the impression where it was somewhat like a domino effect. Like, well, they weren't negligent. And how could the doctor be negligent if he relied on what they had told him? Yes. I'm sorry. Your Honor, I didn't mean to interrupt. Even the plaintiff has specifically conceded. And this is at the reply on page two. Quote, plaintiff's theory of Dr. liability differed from her theory as to the nurses. It's not intertwined if it's an entirely different theory. And here, as even the plaintiff has conceded, it was an entirely different theory. So there's not an intertwining of these claims. They can absolutely be separated in a way that the nurses become witnesses. They were allowed to testify as witnesses. And the jury was then allowed to evaluate that separate theory of liability against Dr. Schneider. Mr. Trucco, I had a question about why was there no objection to a pediatric nurse giving testimony regarding appropriate triage methods? Your Honor, I don't. So I know we're going down a rabbit hole on that. But it bugs me. It was bugging me. So I just. I appreciate that. Nurse Harris, who is the pediatric nurse practitioner, was giving the opinions against Mark Jasper as it related to his conduct at 24 p.m., which was after the patient moved out of triage. Scott DeBoer was the RN who was giving the opinions regarding nurse Shriver's conduct in triage. And as it relates to pediatrics, we did, I believe my memory is, we did address the issue on cross-examination of nurse Harris as it relates to her ability to comment on the standard of care in an adult emergency room. But that's based on my recollection, Your Honor. Thank you. No other questions. Thank you, Justice.  Just a couple. Ms. Weiler, I'll start with you because you were the more recent. How would you describe the theory against your client at trial? The plaintiff's claims against Dr. Diseniaker were twofold, that around 7 o'clock, Dr. Diseniaker should have more fully evaluated Ms. Jones, including looking at EKGs for progressive signs of sepsis. And then around 9 o'clock, the allegation was that Dr. Diseniaker failed to identify sepsis, improperly ordered a CT scan. Again, these are the allegations. Yeah. Or improperly ordered a CT scan to rule out a neurologic stroke and should have ordered IV fluids and antibiotics without delay. Those are entirely separate from the claims against the nurses. Sure. And so when we're – what about this idea, though, that the doctor started with bad information, with incomplete information? Was that part of the trial testimony against the doctor, that he was a doctor who should have been told more? That she, Your Honor, if I may? She. No, that's all right. It's not necessarily clear from the record. No, the testimony about Dr. Diseniaker involves the plaintiff's theory that she should have done more of an investigation. Now, there is, to be clear, there is lots of argument, as Ms. Rosen has alluded to already, that the initial error, if you will, was the categorization of Ms. Jones as an ESI-3 patient as opposed to an ESI-2. And that does – there is a connection there because, of course, Dr. Diseniaker eventually is evaluating the patient. But there's testimony that that would not have changed the manner of the evaluation. I hope that answers your question. It does. Did the doctor argue either in closing or through the trial? Was it the doctor's position that maybe the nurses did screw up, but that's not my fault? No. In fact, Dr. Diseniaker was very plain that had she known that Ms. Jones did not have a spleen, nothing about her care would have changed. And that's important to understand in terms of the context of what Dr. Diseniaker was explaining. She testified about the care that she gave the patient and why her differential diagnosis included specific things like sepsis, any sort of bacterial infection. That's what Dr. Diseniaker was trying to identify, and that's what she was treating for. So even if she had known that Ms. Jones did not have a spleen, she would have been evaluating those particular possible reasons for a bacterial infection, and she would have ordered the exact same treatment. Whether or not she had specific information about Ms. Jones not having a spleen would not have changed her treatment decision. Mr. Trucco, let me turn to you for a moment. Okay, so when we're looking at the report from Dr. G, Dr. Gabeff, you're probably the only person who knows how to pronounce that name. It's Gabeff, Your Honor. I believe that's how he pronounced it. Ms. Weiler probably does, too. Okay, so Dr. Gabeff, you talk about Paragraph 9, and you talk about the fact that I think what you're saying is that to the extent that Dr. Gabeff was criticizing the lack of adequate information being given to Dr. D, it was for the failure to learn about possible symptoms of SIRS. Is that what you're saying? That's very close, Your Honor. What the point was is what Dr. Gabeff was saying was Nurse Schreiber and triage's failure to get a history of SIRS, the signs and symptoms of SIRS, should have led in his, and that's based on 3, 4, 5, 6, and 9, in his opinion, as articulated in Paragraph 6 of this report, that that should have led her to be a Category 1, which would have led her to be seen sooner. It wasn't an issue of Nurse Schreiber communicating anything directly or specifically to a later provider. It was simply a different categorization under the ESI Severity Index, for which he then says, he said a 1, DeBoer said a 2. But in that regard, the claim was that she would have been seen sooner. And importantly, on that point, there was no actual evidence in the record on this busy Thanksgiving weekend that had this patient been categorized as a 2 versus a 3, that she would have been seen any sooner than when Dr. Disinayaka saw her to evaluate the EKG at 7 p.m. All right. And I'm getting a little turned around when we are talking about, you know, the phrases like complete medical history. I think your point is, is that even if we liberally construed references in his report to a complete medical record, complete history, that he never said anything about a splenectomy or steroids. That's not in here, right? That is my position, Your Honor. Yes. Is it your position that there is no claim in this report of proximate cause at all? No, Your Honor, that is not. In the conclusion, the only place I see anything that remotely relates to an opinion regarding proximate cause is in the first sentence of the conclusion at C1049. And that's it. If treated at any time, she would have had a greater than 50% chance of being alive today? Yes, Your Honor. And just so it's clear, my argument is that, and the argument in the trial court was, the causation opinion has to be linked to the deviation. The deviations that he was relying on were with respect to the failure to get a history of SERS, but the board testified at trial that it was a failure to get a history of steroids and splenectomy. So it was an unsupported opinion without a basis. With respect to JASPER, he never reviewed and never disclosed that he relied on Nurse Harris's report. So that opinion, that conclusory opinion, which doesn't drop down to the specifics as articulated in Sullivan, was never linked to the opinion of the witness who was giving the standard of care opinions against Nurse Jasper. Wouldn't the result of either deviation, and I'm saying alleged deviation, of course, I'm making no findings, but if the nurse's deviation had been the failure to ask questions regarding SERS or to ask questions regarding steroids or to ask questions regarding splenectomy, wouldn't the result of any of those things, if allegedly done correctly, lead to a quicker treatment of the victim, of the decedent? No, there's no evidence of that, Your Honor. There's no evidence in this record of that. As to, you know, there are expectations. The testimony was from Dr. Gabeff that he believed that as an emergency room, the institution should have seen her within 30 minutes. Nurse Schreiber testified that based on her experience, she would have anticipated the patient being seen within an hour. And the testimony is that Nurse Schreiber re-evaluated the patient, checked her vitals at 6.50 p.m., and then Dr. Disinayak saw the patient at 7 and to review the EKG and to ask her how she's doing, ask her her medical history as articulated in the briefs. Okay. And when the trial judge ultimately ruled, she ruled on disclosure, right? She didn't rule on the lack of it. Will you tell me, did she rule based on a lack of an evidentiary foundation laid, or did she rule based on the fact simply that there was no insufficient disclosure of the opinion? So, Your Honor, on the motion for the directed verdict, the principle basis for that ruling was on the absence of a properly disclosed opinion connecting the deviation to the opinion regarding causation. There were other issues that were before the court in the motion for directed verdict. For example, the issue of the Aguilaria issue that was addressed in the briefs, specifically that Dr. Disinayak did testify that even with this information, when she saw the patient either at 7 or 9, she wouldn't have treated the patient any differently. Plaintiff characterized that as a gift, but there was an absence of any testimony from Dr. Gabath that a reasonably careful emergency medicine physician with that information would have acted differently. And so that was an additional failure. Okay. So, counsel, I may have misspoken, but I'm really referring to the ruling that Dr. Gabath could not testify as to causation. I'm sorry, that was strictly disclosure. It was strictly on disclosure. The judge didn't rule that he didn't have sufficient foundation. He didn't rely on things. There was insufficient evidence, anything like that. What she said is you didn't tell the defendants, you tell me, tell me if I got this wrong, but I think what she was saying was you didn't disclose to the defendants that this doctor was going to testify that the nurse's deviations from the standard of care was approximate cause of death. That's what she ruled, right? She ruled that, I want to make sure I'm clear on this, Your Honor, the ruling was that the alleged deviations from the standard of care were, as it relates to Nurse Schreiber, disconnected from his opinion because it was the DeBoer opinion about the history of splenectomy and steroids, which was not the basis for Dr. Gabath's opinion about causation with respect to Nurse Jasper. It was Nurse Harris's report, which Dr. Gabath never reviewed and didn't disclose that he relied on, and therefore there was no foundation basis for the connecting to the causation opinion. Okay, so your position is, and I think this, what you're saying the judge said, I think I'm following you here, but tell me if not, it's not that the doctor's report didn't suggest proximate cause or alleged proximate cause, whatever word you want to use. It's not that Dr. G's report did not claim that the nurse's conduct was a proximate cause. It's that the, this gets confusing, but I think if you're with me so far, it's not that there's no mention of proximate cause. It's not that the finger isn't pointed at the nurses. It's that the thing that Dr. G criticized about the nurses was not the evidence presented at trial that would get you to a deviation of care, and therefore you can't argue, you can't testify as to proximate cause based on a basis that's not in the record. Does that sound right? That is correct, your honor. The only, the only proviso I would say to that is that with respect to the finger pointing, and I know you're using it colloquially, is that the Dr. Gabav, in his deposition, said I have no criticisms of nurse Jasper. Okay. All right. Thank you very much for your time, both of you. Thank you. Mr. Truckel, when I was going through the record, I saw where, when this issue came up, the trial judge said this is hit in the face. He knows what it is, but he didn't say it, but it's hit in the face. The reason I ask this question, in Sullivan, there's another portion where they discuss what should happen when there's nondisclosure and the factors that a trial judge should consider before excluding a witness. And those factors are, one, surprise to the adverse party, prejudicial effect of the testimony, nature of the testimony, the diligence of the adverse party, the timely objection to the testimony, and the good faith of the party calling the witness. How did the trial court handle those issues in this case? Well, I'll answer that in two steps. Okay. The first step, Your Honor, is with respect to the notion of the complete history and everything is hitting us in the face. That phrase had different meanings to nurse DeBoer, the standard of care witness, and a different meaning to Dr. Gabav. To nurse DeBoer, it meant a complete history to get the history of steroids and the prior surgical history of a splenectomy. To Dr. Gabav, it meant the failure to get the history of the signs and symptoms of SERS, systemic inflammatory response syndrome. So with respect to everybody knows it's hitting us in the face, everybody did. It's a history. But what differed was what the history was and was the basis for that causation opinion. Your Honor, with respect to the second part of your question, and as it relates to the factors in Sullivan, the issue here with Dr. Gabav was not part of testifying. He was precluded from testifying to opinions that were based on bases that had not been properly and previously disclosed. And in that regard, Your Honor, I believe, and this issue was argued extensively before the trial court. The trial court took great steps and time and devoted great time to considering it. She read the depositions. She read the trial testimony. And under the abuse of discretion standard, I believe the trial judge, even before you get to the abuse of discretion, I believe she decided the case properly and decided the issue properly based on the failure of compliance with Rule 213. And at this level, I believe it was a reasonable decision based on the record before her. So she never articulated those factors in the decision is what I'm getting to. I don't recall that the trial court articulated those specific factors in her oral ruling. Now, you kept saying a diagnosis of SERS. That's just a diagnosis for temperature and blood pressure and what else? There are four elements of SERS, Your Honor, an elevated temperature, an elevated pulse, elevated respiratory rate, and an elevated white blood cell count. Now, when you say that, you know, we all have, some of us have been old enough to go get our COVID shots. And the first thing they ask you, what medications are you taking and what surgeries have you had? And I mean, that's just for a shot. When someone's in an emergency, wouldn't it be anticipated that something more would be required? So one of the issues in this case, Your Honor, was at what point should that be required? And that was one of the issues in the case. Specifically, as it related to triage, the testimony was extensive from Nurse Schreiber and from the standard of care witnesses in the case regarding what the job of a triage nurse is. And the job of the triage nurse is to do a preliminary assessment in order to categorize the patient on the ESI severity index, which dictates the orders. And that's in the record about what the differences are between an ES1 and an ES5. And so that issue was talked about, and I believe the testimony of Nurse Schreiber was, is that she did a very general discussion and asked the patient for any significant past medical history. And so then the testimony also is a trial that a more complete assessment is done by the provider who sees the patient when the patient is not in the triage area out in front, but is in the department, if you will. All right. Thank you. I have no further questions. Anybody else? Any other judge have a question? No? Great. Ms. Rosen? Very short. A very short rebuttal. Mr. Trucco is saying there's a disconnect between what the people thought was a complete history, and he bases it on paragraph six of the report. Well, first of all, our witness, Dr. Gebess, was considering a history of SIRS. There's no such history of SIRS. It was only, you can't, that just doesn't make any sense. She had a history of a splenectomy, and that's what I believe that a well-trained provider, and that's the triage provider, would have recognized her as a category one based on her complete history. Not her complete history. Right at that SIRS, she had two, at that point, she had two of the four elements of SIRS. She had a temperature of 100.6, and her pulse was 89. An hour later, the pulse was 109, and her temperature ended up going to 102. It was 101 an hour later. So I think that's a made-up disconnect. There's no disconnect there. Everybody knew this was a history of a splenectomy. And any disconnect with Harris was for cross-examination. And that was done in cross-examination. So I have, there's no question that you have the power, the authority to affirm as to the doctor. I know that. I said that. I concede that. But I do say that in light of the fact that this whole trial revolved around the mistriage and the failure to treat in a timely manner, and so much focused on the nurses, and there was talk of the spleen, and there was talk about the nurses, but the whole context of the case involved everybody. So it really wasn't fair in that regard. And you asked, Justice Ellis, you asked Ms. Weiler, in closing argument, if the doctor testified, if the doctor talked about that she wouldn't have done anything. And I believe Ms. Weiler was referring to her testimony that she wouldn't have done anything. She wasn't referring to the closing argument at that time. I'm not 100% sure that it wasn't in the closing argument, but I do not believe it was. But she did testify she wouldn't have done anything differently. And, again, this is a great opportunity to clear up the mess that was created in Seif versus Ingalls, that that gives everybody a get-out-of-jail-free card. That's it. All right. Thank you. Do either of the justices have any additional questions based on what was just said? I do briefly. I want to go back to what you said, Ms. Rosen, about I think it's paragraph 9 of the report. So you're saying that when Mr. Trucco talks about SERS, that wouldn't be a part of a history because you don't have a history of SERS. Yes, that's what I'm saying. Okay. So educate me. What is SERS? SERS is a shorthand system for determining if a person is going to have sepsis because sepsis is the number one killer in an emergency room, and it comes fast. You don't have a history. As our expert testified, you can be fine one day and dead the next, and that's not uncommon, but it doesn't happen. Okay. So it's an elevated temperature, which she had. She had elevated pulse when she was triaged. That's two out of four. And then the others are the respiration rate and the infection, white blood cell. She had the white blood cell, so she had three of the four symptoms at 7 o'clock because they took blood by 8 o'clock. She had the white infection problem. So you would say that taking this in context, that when we reference, when the doctor references complete history in paragraph 6 or number 6 in the report, that that could only be talking about or it would at least have to reasonably include a history of sepsis. Is that correct? No, I'm saying it would have to have a history of spleenectomy. She has no history of sepsis. Okay. That afternoon by the infection, and it's virulent and fast and deadly. And that's why it has to be treated. She had no history of sepsis, never had sepsis before. You're not likely to get sepsis twice. You have it once, near death. You know not to let it happen again. You tell me that. Okay. If I could, Mr. Trucco, what is your response to that? Your Honor, my response to that is, one, I'm not a physician. So whether you can get it once. Second, I'm going based on what's there in the report. And I would encourage the court to look at paragraphs 3 through at least 9 in consecutive order. And that is clearly in context. The reasonable interpretation of that is the failure in triage was to obtain the proper information, to understand that this patient had SERS, and to change the PSI categorization in Dr. Gabeff's view to a 1, not a 2. And in no place in those paragraphs is there any reference, nor was there in the deposition or any supplement, that the complete history included a medical and a surgical history. And to Justice Burke's point, a complete history could be a history of any number of different things. And it wasn't specified. Okay. All right. That's all I have. Thank you. Justice Burke. All right. All right. Very well. This matter will be taken under advisement. The case was well-argued, well-briefed. A complicated situation. It was well done, though. We'll take it under advisement, and the decision will be issued in due course.